## FURMAN *v.* NICHOL.

1. A cause can be removed from a State court into this court under the twenty-fifth section of the Judiciary Act of 1789, whenever some one of the questions embraced in it was relied on by the party who brings the cause here, and when the right, which he asserted that it gave him, was denied to him by the State court, provided the record show, either by express averment, or by clear and necessary intendment, that the constitutional provision did arise, and that the court below could not have reached the conclusion and judgment it did reach, without applying it to the case in hand.

2. It need not appear that the State court erred in its judgment. It is sufficient to confer jurisdiction that the question was in the case, was decided adversely to the plaintiff in error, and that the court was induced by it to make the judgment which it did.

3. The provision in section 12 of the charter of 1838 of the Bank of Tennessee, "that the bills or notes of said corporation, originally made payable, or which shall have become payable on demand, in gold or silver coin, shall be receivable at the treasury of the State, and by all tax collectors and other public officers, in all payments for taxes or other moneys due to the State," made a contract on the part of the State with all persons, that the State would receive for all payments for taxes or other moneys due to it, all bills of the bank lawfully issued, while the section remained in force. The guaranty was not a personal one, but attached to the note if so issued; as much as if written on the back of it. It went with the note everywhere, as long as it lasted, and although after the note was issued, Section 12 were repealed.

4. Section 603 of the Tennessee Code of 1858, which enacted that besides Federal money, controllers' warrants, and wild-cat certificates, the collector should receive "such bank notes as are current and passing at par," did not amount to a repeal of the above quoted 12th section; the words of the code having no words of negation, the two enactments being capable of standing together, and implied repeals not being to be favored.

5. This decision does not apply to issues of the bank while under the control of the insurgents.

ERROR to the Supreme Court of Tennessee, the case being this:

In 1838 the legislature of Tennessee chartered a bank, enacting as follows:

" A bank shall be, and is hereby established in the *name and for the benefit of the State,* to be known under the name and style of 'The Bank of Tennessee,' and the faith and credit of the State are hereby *pledged* for the support of said bank."

The capital of the bank, which was five million dollars, consisted chiefly of the school fund of the State and of surplus revenue of the Federal government. The deficiency was to be made up by funds raised on the faith of the State. The dividends which the bank should make were to be applied to common schools and academies, and the bank itself was to be managed in aid of internal improvements. Any losses arising to the trust funds used to make the capital were to be made good by the State. The governor was to nominate to the General Assembly, for confirmation or rejection, twelve directors, to serve for two years, as officers to manage its affairs.

The twelfth section of the charter contained this important provision:

" That the bills or notes of said corporation originally made payable, or which shall have become payable on demand in gold or silver coin, shall be receivable at the treasury of this State, and by all tax collectors and other public officers, in all payments for taxes, and other moneys due to the State."

The bank went into operation with branches in different parts of the State, and was employed largely in various ways as the fiscal agent of the government.

In May, 1858, the legislature of the State passed an act to revise the statutes of the State, and so established its " code." In this code were certain enactments, thus:

" *Section* 603. The collector shall receive, in discharge of pub-

lic taxes and other dues to the State, besides the constitutional and lawful currency of the United States,

"1st. *Such bank notes as are current at-par in this State.*

"2d. Warrants issued by the comptroller.

"3d. Certificates from the county court for killing a wild-cat."

"*Sect.* 41. All public and general acts passed prior to the present session of the General Assembly, and all public and special acts, *the subject whereof are revised in* this code, are hereby *repealed.*"

"*Sect.* 42. Local, special, and private acts, *and acts of incorporation* heretofore passed, are *not repealed,* unless it be *herein so expressed.*"

From the character of its organization, the newly incorporated bank was capable of being placed much under the control of the governor and legislature of the State; and at the outbreak of the late rebellion in Tennessee, *May 6th,* 1861, it passed into the control of the rebel agents, who then managed to possess themselves of the State government. They issued its notes to an indefinite amount, advanced immense sums to the rebel State authorities; and when the Federal army were approaching with superior power, left the bank, carrying with them its coin, and all its assets, except real estate and some uncollected debts. The bank was thus ruined, and its bills became largely depreciated.

In February, 1865, the rebel powers being now driven away, the people of the State reorganized the State government, and declared, in their amended constitution, that "all notes of the Bank of Tennessee, or any of its branches, issued on or after the 6th day of May, 1861," were null and void; and an act of the legislature in the following June, repealed by express terms, the already quoted twelfth section of the chartering statute of 1838, which made the notes of the bank receivable in payment of taxes. Finally came an act of February 16, 1866, by which the directors were directed to take in payment of debts due to it its notes, "which were issued prior to the 6th day of May, 1861, and studiously to refuse and exclude all issues *or reissues* after that date; also all issues signed by G. C. Torbett; also, all *reissues* made after the 6th day of May, 1861, as utterly void."

In this state of things, with these statutes, relative to the subject of the sort of money in which taxes, &c., might or might not be paid upon the statute-book—and with other statutes of the State in force, which made the privilege of merchandising taxable, and enacted that any one who wished to engage in that calling must obtain a license from the clerk of the county court where he proposed to carry on the business, and give bond that he would pay a certain percentage on the invoice cost of all goods brought into his mercantile establishment for sale during the year—one Francis Furman, of Nashville, who had obtained, in August, 1865, from the county clerk, a license as a wholesale merchant for the ensuing year, and now purposed forming a partnership before the expiration of his license (a purpose which made it necessary for him to discharge his obligation to the State for the business of the store up to that time), appeared, on the 3d of August, 1866, before the clerk of his county, with Green, his proposed partner, and tendered to the clerk the amount due the State for taxes, in the notes and issues of the Bank of Tennessee, *issued prior to the 6th of May*, 1861, and tendered also the bond as required by law, and demanded that a license be issued to them as wholesale merchants. But the clerk declined to comply with this request, because these notes were depreciated, and informed the parties that he would not issue the license, unless the taxes were paid in par funds.

Thereupon Furman & Green applied to one of the circuit courts of the State for a mandamus to compel the clerk to receive their bank notes.

Their petition, after setting forth the charter of the bank, and particularly the provisions of the *twelfth* section, the ownership of the notes, and that they were issued in conformity with the section just named; *and issued "prior to the 6th day of May*, 1861," alleged the tender to the defendant, his official character, and his refusal to receive them, " because the same were not at par," and issue the license; adding that the " said charter was a *contract* made with the people of the State, and *every person into whose possession the*

*said notes and issues of the said bank might come,* that the same should be received by all collectors of taxes, and in payment of all dues to the State of Tennessee, and it is not in the power of the legislature of the said State of Tennessee, to impair or annul the validity or binding force of said contract." The petition referred to the act of February, 1866, by which the directors were directed to take in payment of debts due to it notes issued prior to May 6th, 1861, and to exclude reissues made after that day, and it made the act part of it, so far as the act might be in conflict with their rights. *But the petition did not state at what time the notes had come into the hands of the petitioners.*

The county clerk demurred:

1. Because the petition did not show a contract between the State of Tennessee and *petitioners,* or either of them, that the notes in question should be received in payment of State taxes; and,

2. Because it failed to show ownership of the notes *before* the passage of the Tennessee code, 1858, with its section 603; *or* before the repealing act of 1865.

The local Circuit Court thought the demurrer bad and awarded the mandamus, but the Supreme Court of the State on appeal considered it good, and reversed that decree; the judgment having been in these words, and without any assignment of reasons.

"The court being of opinion that there is error in the judgment of the court below, in overruling the demurrer in this cause, doth order and adjudge that the said judgment be reversed, and the demurrer sustained, and the petition dismissed."

The case was now brought here on appeal, under the 25th section of the Judiciary Act, which gives this court jurisdiction to review decrees in the highest court of the State, "where is drawn in question the validity of the statute of, or an authority exercised under any State, on the ground of its being repugnant to the constitution, treaties, or laws of the United States, and the decision is in favor of such their validity."

Two questions were here argued :

1. Whether under the 25th section just quoted, jurisdiction existed in this court?

2. Whether the act of incorporation amounted to a contract with these petitioners; their petition not showing that they had themselves received the notes prior to either the statute of 1858, making the code having section 603; or the act of 1866, repealing the 12th section of the original charter.

*Messrs. B. R. Curtis, R. L. Caruthers, and G. Hoadley, for the appellants :*

1. *As to jurisdiction.* That it exists, is plain, since the decision in *The Bridge Proprietors* v. *Hoboken Company,** a case decided so late as 1863. There the court says :

"The true and rational rule is, that the court must be able to see clearly, from the whole record, that a certain provision of the constitution was relied on by the party who brings the writ of error, and that the right thus claimed by him was denied."

Now here, if any one will observe the character of the petition and of the demurrer, it will be as obvious without argument as with it, that the question raised and decided was, by necessary intendment, none other than the constitutionality of the act of repeal, as against the plaintiffs, in violation of the contract with the State to receive the notes for taxes, and the decision in favor of its validity.

2 *On merits.* The 12th section of the act of incorporation of the Bank of Tennessee was, until repealed, a contract between the State and every bill-holder of the bank, obliging the former to receive the bills for taxes. The contract which we assert arises out of a law. Whatever negotiability and virtue the legislature intended the bills should have, that they do have. Now, what did the legislature intend? The bills were to be receivable by all tax collectors of the State for all moneys due it. Receivable from whom? From the bearer, of course. The design was to aid the bank substantially, by inspiring the greater confidence in its bills; and this confidence could be inspired in no way so well as by

---

* 1 Wallace, 143.

attaching to the *bills* a special virtue, the quality, to wit, that they should be receivable in payment of all debts due the State; so receivable generally and from every one. We have at this time a currency of government notes known as "greenbacks." The act of Congress authorizing them enacts that they shall be a legal tender for all debts, public and private (except for two named), and be receivable in payment of all loans made to the United States. And, as we know at this time, this provision of the statute is printed on the back of the notes. No one would doubt that the contract of the Federal government, in regard to these issues, attaches to the bill. But why does it so attach? Not in virtue of the mechanical fact of its being printed on the note, but in virtue of the statute authorizing the notes, and giving to them the advantages which it does. The same thing exists here. If the 12th section of the charter of the Bank of Tennessee had been printed on all notes of the bank, it would be conceded that the privilege followed the bills and attached to them in the hands of every holder. But the printing of the law on the back of the bill is nothing. It is the law itself, its having been enacted and enrolled in the Capitol, which gives the distinctive virtue.

The section 603 of the code did not repeal the twelfth section of the charter. It could repeal it only by a feeble implication. Implied appeals are not favored. Courts, indeed, would be slow to pronounce in favor of an implied repeal of a section, which gave value and credit to the issues of a bank, that was, perhaps, daily increasing in circulation, and that had been established with the funds, and for the benefit of the State itself, to supply a circulating medium to pass from hand to hand of the people as money.

If section 603 of the code repealed impliedly section 12 of the charter, of what use was the express repeal of the same section by the act of 1865?

The case is then decided by *Woodruff* v. *Trapnall*,* as well as by numerous later cases.†

---

* 10 Howard, 206.

† Curran *v.* State of Arkansas et al., 15 Howard, 304, Hawthorne *v.* Calef,

In *Woodruff* v. *Trapnall,* where the facts, though resembling ours, were immeasurably stronger than they, the court says:

" The guaranty included all the notes of the bank in circulation as clearly as if on the face of every note the words had been engraved, ' This note shall be received by the State in payment of debts.'    And that the legislature could not withdraw this obligation from the notes in circulation at the time the guaranty was repealed, is a position which can require no argument."

*Messrs. Maynard and Harrison, contra:*

1. *As to Jurisdiction.*—It is nowhere averred in the petition, as it ought to have been in order to bring the case within the twenty-fifth section, that the State had passed a law impairing the obligation of a contract.   Nor can this be inferred by any necessary intendment from the record.   The court below does not assign any reasons why it sustained the demurrer. The record indicates that the main question in that court was, upon a construction of the act of 1838; a question, namely, whether there was any contract arising out of the twelfth section, as contended for by the plaintiffs, and as to the *legal effect* of plaintiffs in error taking the bank issues tendered, *after* the act of 1858 and the act of 1865.

If the court decided (as we may remark that in fact it did) that there was no contract, none at least running with the note, created by that act, the matter involved the construction of a Tennessee statute by a Tennessee court, not the validity of any statute ; and the matter is not revisable here.*   But looking to the record in a less favorable light, we must assume that the court may have decided the case upon either one of the causes set down in the demurrer, viz., that there was no contract, or that the plaintiffs in error were not entitled to maintain their petition, because they failed to show that they became the holder of the bank issues prior to the

2 Wallace, 10; McGee *v.* Mathis, 4 Id. 143 ; Von Hoffman *v.* City of Quincy, Ib. 535.

  * Railroad Company v. Rock, 4 Wallace, 177.

act of 1865, or lastly, that they were not entitled to maintain their suit, because they did not show they became the holder of said notes, the issues of the Bank of Tennessee, before the passage of the act of 1858.

It may have decided on any one of these grounds, and not have decided in favor of a law passed by the State and asserted by the party against whom the decision was given, to have impaired the obligation of a contract. If this is so, then there is no jurisdiction under the twenty-fifth section.

The decision would have gone off upon the construction given to these several statutes of Tennessee, particularly to section twelfth of the charter. But when the construction alone, and not the validity of a State statute, is involved in the decision of the State court, no jurisdiction exists under the twenty-fifth section.* Independently of all which the judgment was right—as we show hereafter.

2. *On merits.*—Obviously there was no contract with the *bank*, and none with persons who had not yet received the notes. There is no guaranty on the face of the note, nor anything, anywhere, operating like a covenant running forever, with the land. Whatever contract existed arose from a statute. So long as section 12 remained on the statute-books unqualified and unrepealed, there was a proposition of the bank of this sort. It was first to the persons to whom the notes were first offered by the bank. To them the State in effect said: "If you will receive these notes from the bank, we will receive them from you." And the proposition was, in fact, repeated whenever the notes were offered to new parties by the original takers, and a contract was made whenever by those new parties the notes were accepted.

Thus, if section 12 remained unrepealed and unmodified, and so long as it did so remain, the notes would go on circulating with all the rights in their holders given by section 12, not because of a guaranty running with the note, for none was on it, but because as long as the proposition was continued and accepted, a separate contract was made. But

---

* Commercial Bank *v.* Buckingham, 5 Howard, 317.

the State had a right, without doubt, to repeal or to modify its propositions, and if, after the modification or repeal, any person took the notes, he took them with a knowledge of what was done, and gave credit accordingly.

Now, unquestionably, the act of 1865 did repeal the twelfth section of the charter, and, unless the party shows (which these petitioners do not pretend was the fact in their case), that he got the notes prior to the repeal, he makes no case against the State.

2. Independently of this, these petitioners allege that the notes they tendered were issued prior to May 6th, 1861. This is not enough. The notes, when tendered, having been below par, as the petition shows, the petitioners should have alleged that the notes were issued prior to May, 1858, when section 603 of the code came into force. Admitting the view of the other side, that the contract attached to the note in every one's hands, and always, it will not apply to any notes after the legislature in any way took away the privilege given by section 12.

Now the contract was modified by section 603 of the code. We need not and do not argue that this section *repealed* section 12 of the charter. It is enough if it amounts to a certain modification of it. And this it did. It was in *pari materia* with section 12. It was in a code, that is to say in a statute, making a *corpus juris*, or body of the law, in which all previous provisions on any given subject were comprehended, arranged, enlarged, diminished, qualified, first enacted, or repealed. The section 603 first of all adverts to one class of money in which, independently of State power, taxes were payable, viz., constitutional and lawful money of the United States, and then makes a comprehensive enumeration, specifying, generally and particularly, both the sorts of money and the sorts of things in which, by its authority, the same taxes might also be paid. One of the provisions—" such bank notes as are current and passing at par"—included, by pre-eminence, as a matter of then existing fact, all notes of the Bank of Tennessee; for the notes of no bank circulated so largely or were so much confided in. It

probably meant specially to include them.    It gave the notes
certainly the same value as did section 12 of the charter,
qualifying, however, by a familiar principle of legal herme-
neutics, the privileges whenever the notes should cease to
be at par, a condition not in the least anticipated at that
time, but one to which, unhappily, and by extraordinary
events, have since arrived to them.

The fact that we assert section 603 to be but a *modification*
of section 12 of the charter, answers the question of the
other side as to the act of 1865 repealing expressly that sec-
tion 12.    After the act of 1865, the notes of the Bank of
Tennessee were not receivable at all; not even if they were
at par.    Before it and after the enactment of the code, they
were receivable *if* at par.

3. There is no allegation in this petition that the notes
tendered were lawful issues of the bank.    The general alle-
gation in the petition that the notes tendered were issued
prior to the 6th of May, 1861, was not sufficient, because
they may have been *reissued* after the 6th of May, 1861.    It
is evident from the act of February 16, 1866, made part of
the petition, that notes of the bank, *although dated prior to 6th
of May*, 1861, *were reissued after that date.*    This court will
not validate the acts of rebels and robbers who seized on the
bank and reissued notes in this unlawful manner.

4. We have already said that the contract was one derived
from statute and given to the person who took the note dur-
ing the existence of the statute.    The repealing act of 1865
put an end to the contract.    After that date the notes lost
their privilege.

5. If *Woodruff* v. *Trapnall* went to the extent of covering
with the privileges of section 12 all the issues of this bank,
we should ask, in view of the dissent by four very able
judges of that day, including Grier, J., happily surviving, to
review this case.    We should insist that the taxing power of
the State could not be irremediably annulled by a legislature
assuming to bind the State to receive mere paper in payment
of its revenues; that the treasury could not thus be help-
lessly committed to what might prove as worthless as South

Sea certificates, or Confederate paper; that the taxing power unlimited and unrestrained, was vital, and could not be annihilated by being traded away; that power could not be constitutionally given to dishonest officers to bind the people of the State to the burden of redeeming multiplied millions of their promises, leaving the government, meanwhile, with no available source of revenue. But *Woodruff* v. *Trapnall* is not this case. The bank there was merely a money-making money agent of the State. The capital was borrowed on the credit of the State, and all dividends belonged to it. Here the capital consisted of certain trust funds, and was itself a sacred fund, set apart by the constitution of the State, and invested by public-spirited men, so as to be profitable for the purposes of the trust. The bank was used as a fiscal agent and public depositary in promotion of the general objects of the trust. The provision of the twelfth section was merely a regulation to govern the revenue officers of the State; a rule directory to the revenue officers and an authority to them, protecting them from liability should they receive the paper and loss ensue. It was not a contract with the holders of the bank paper, superadded to such contract, as the officers of the bank might think proper to make and express in language upon the paper itself.

In *Woodruff* v. *Trapnall*, it was admitted that the State might repeal the provision giving virtue to the notes, and that " the emissions of the bank subsequently are without the guarantee." As in this case, the plaintiffs do not allege a tender of notes issued prior to the enactment of section 603, that is, prior to 1858, but only of those issued prior to May 6th, 1861, they have not brought themselves within the provisions of the section.

Mr. Justice DAVIS delivered the opinion of the court.

The main question involved in this suit is of more importance than difficulty; but before we proceed to discuss it, it is necessary to consider the point of jurisdiction which is raised by the defendant in error. The circumstances under which this court is authorized to review the decisions

of State tribunals has been so often considered and decided, that there is hardly anything left to do, but to apply the already well-settled legal principles which govern this class of cases, to a particular record, in order to decide, whether or not we have jurisdiction to hear and determine the matter in controversy. It would be useless labor to go through with the various adjudications of this court on this subject. It is enough for the purposes of this suit to say, that a cause can be removed from a State court into this court under the 25th section of the Judiciary Act of 1789, whenever some one of the questions embraced in it was relied on by the party who brings the cause here, and when the right he claimed it gave him, was denied to him by the State court. It is urged that the particular provision of the Constitution, which the plaintiffs in error say has been violated in its application to their case, should be contained in the pleadings, but this is in no case necessary. If the record shows, either by express averment, or by clear and necessary intendment, that the constitutional provision did arise, and that the court below could not have reached the conclusion and judgment it did reach, without applying it to the case in hand, then the jurisdiction of this court attaches. And it need not appear that the State court erred in its judgment. It is sufficient to confer jurisdiction that the question was in the case, was decided adversely to the plaintiffs in error, and that the court was induced by it to make the judgment which it did.

Testing the case at bar by these rules, it is apparent that it is properly here, and must be disposed of on its merits.

Furman and Green, conceiving themselves aggrieved by the conduct of the county clerk in refusing their tender of the amount due the State for taxes in the notes and issues of the Bank of Tennessee issued prior to the 6th May, 1861, applied to the local Circuit Court for a mandamus to compel the county clerk to accept payment of the notes in discharge of Furman's obligation, and to issue to them a license as wholesale merchants. The application for the writ proceeded on the theory that the State had, in the passage of the act creating the Bank of Tennessee, in 1838, made a

contract with its people to receive these notes in payment of State taxes, and that it was not in the power of a subsequent legislature to impair the binding force of this contract.

The proceeding was an effort on the part of the plaintiffs in error to test the question of the validity of the authority of a public officer of the State, exercising authority under the State, on the ground that such authority was repugnant to that provision of the Federal Constitution which forbids a State to pass any law impairing the obligation of a contract. The purpose of the petition, the issue which it presented and sought to have determined, were as plainly to be seen, as if the words of the particular constitutional provision relied on had been inserted in it, and the obnoxious legislation spread out at length. All courts take notice, without pleading, of the Constitution of the United States, and the public laws of the State where they are exercising their functions.

It is insisted that the petition should have averred that the State had impaired, or by some act attempted to impair, the obligation of a contract, but this does sufficiently appear by necessary intendment, for it is alleged that Furman was the owner of the notes and entitled to have them received for taxes, by virtue of a contract with the State; that he had tendered them to the defendant, who refused to receive them, and that it was not in the power of the legislature to impair the validity of this contract.

The mandamus was asked for to enforce a contract—to act directly on Nichol, the clerk and collector, who was exercising an authority under the State. What is plainer than that this proceeding impeached this authority, in its application to their case, because of legislation construed by this officer as depriving Furman of his right to pay his State taxes in notes of the Bank of Tennessee. If so, then the petitioners, insisting on the protection of the Constitution, drew in question both the validity of State legislation and the authority of the State officer; and unless the record discloses that the Supreme Court of Tennessee denied relief

on other than Federal grounds, it is perfectly manifest that we are compelled to take jurisdiction of this cause.

But to proceed a step further. The cause was heard on the petition and a demurrer, admitting its truth, but denying its sufficiency.

There were three principal defences to the relief asked, specified in the demurrer, as was required by the Tennessee code of practice.

These were, first, that 'the twelfth section of the act incorporating the Bank of Tennessee, did not constitute a contract. Secondly, that there was no contract, because the said twelfth section was repealed by implication by section 603 of the code of 1858, and there was no averrent that the notes were issued before that time. The third and last defence was, that the petition did not show that the plaintiffs became the owners of the notes before the direct repeal of the twelfth section by the legislature, in 1865. What possible difference can it make, in deciding the question of jurisdiction, on which of these three grounds the Supreme Court of Tennessee based their judgment? The right and duty of this court to hear and determine this case does not depend on our ability to prove that the Supreme Court of Tennessee was wrong in its judgment. Whether that judgment was right or wrong, it is reviewable here, if it necessarily drew in question the validity of a State statute, or of an authority exercised under it, on the ground of the repugnancy of the statute to the Constitution of the United States. That it did do this there would seem to be no doubt.

The defence really amounts to this, either that the alleged contract did not exist, or if it did, that there has been no legislation that impairs it.

Whether it be true or false, depends on the construction to be given the laws of the State, which are claimed as proving the making of the contract and its violation.

If so, this court decides for itself, whether the construction which the court below gave to these different statutes was correct or incorrect; and we are required to reverse, under the twenty-fifth section of the Judiciary Act, if we find that,

under an error of construction, that court has adjudged that no contract has been impaired.   To do otherwise, would be to surrender to the State courts an important trust confided to this court by the Constitution.

Without pursuing the subject any further, it is clear from the record that the Supreme Court of Tennessee, in dismissing the petition for mandamus, necessarily adjudged that there was not at the time such a contract as the plaintiff, Furman, claimed authorized him to make the tender to the clerk, of the notes of the Bank of Tennessee.   The jurisdiction of this court is, therefore, complete, and the case must be decided on its merits.

The State of Tennessee, through its legislature, in 1838, thought proper to create a bank "in its name and for its benefit."   It was essentially a State institution.   The State owned the capital and received the profits; appointed the directors, and pledged its faith and credit for its support. This would seem to have been enough to establish the credit of the institution on a firm basis, and to inspire confidence in the value of its notes, so that they would obtain a free circulation among the people as money.   But the legislature, in its anxiety to insure for these notes a still greater confidence of the community, went further, and provided that they should be receivable at the treasury of the State, and by all tax collectors and other public officers, in all payments for taxes and other moneys due the State.

It will be readily seen, that nothing could have been better calculated to accomplish the purpose the legislature had in view than the incorporation of this guaranty into the charter of the bank.   It assured the free circulation of their notes, gave them a credit over the issues of other banks, and furnished a security to those who held them against any serious loss, if, in the vicissitudes of trade, the bank itself should become embarrassed; for, annually, they would be enabled to use the notes at their par value in the payment of their taxes.

That this guaranty was, until withdrawn by the State, a

contract between the State and every note-holder of the
bank, obliging the State to receive the notes for taxes, cannot
admit of serious question. .

The State was engaged in banking, and like other corpora-
tions engaged in the same business, desirous of using all
legitimate means to increase the profits of the enterprise.
The profits of a bank of issue depend in a great measure on
the ability of the bank to keep its currency afloat. The
longer the bills are withheld from redemption the greater
the remuneration to the corporation. Every additional
guaranty thrown around the bills, affecting their security
and increasing the uses to which they can be put, affords
necessarily additional inducements for the people in whose
hands they fall to keep them, and not return them to the
counter of the bank for redemption in specie. What so
natural as that the intelligent legislators of 1838, knowing
all this, should say to every person discounting a note, or
taking it in the ordinary transactions of life, " If you will
not return this note for redemption, we will take it from you
for taxes? It is true you can demand specie for the bills,
and so can the State demand specie for taxes, but if you will
forego your right the State will do the same, and consent to
receive from you, in lieu of specie, for the taxes due her, the
notes of the bank." In such a transaction the benefit is
mutual between the parties. The bank gets the interest on
the notes as long as they are unredeemed, and the holder of
the bills has a ready and convenient mode of paying taxes.
The State did, therefore, in the charter creating the Bank of
Tennessee, on good consideration, contract with the bill-
holders to receive from them the paper of the bank for all
taxes they owed the State. Until the legislature, in some
proper way, notifies the public that the guaranty thus fur-
nished has been withdrawn, such a contract is binding on
the State, and within the protection of the Constitution of
the United States.

An attempt is made to restrict the operation of this
guaranty to the person who, in the course of dealing with
the bank, receives the note, and not to extend it further.

Such an interpretation would render the guaranty of comparatively little value, and defeat the object which we have attempted to show, the legislature designed to accomplish by it. The guaranty is in no sense a personal one. It attaches to the note—is part of it, as much so as if written on the back of it; goes with the note everywhere, and invites every one who has taxes to pay to take it.

The quality of negotiability is annexed to the notes in words that cannot be misunderstood, and which indicate the purpose of the legislature, that they should be used by every one who is indebted to the State.

It is contended that the promise of the State was withdrawn in 1858, by section 603 of the code of that year—not in express terms, but by necessary implication. Courts do not favor repeals by implication, and never sanction them if the two acts can stand together. The provision of the code, which is deemed inconsistent with the continuance of the promise of the State, directs the kind of funds which collectors shall, after that time, receive for taxes. The legislature thought fit to confer upon the people the privilege of paying their taxes in the issues of other banks that were at par. As these issues were in circulation at the time, it was doubtless thought a wise policy to allow the people to pay their taxes in them, and as long as they were at par the State could not be the loser. This policy was adopted for the convenience of the people. There are in the statute no words of negation, saying that no funds other than those specified in the section shall be received. But we are to construe the different sections of the code together in order to arrive at the meaning of the legislature. In doing this, we find that where acts of incorporation are not expressly repealed, they are, in terms, saved from repeal by section 42 of the code. As there was no attempt in the code to interfere with the charter of the Bank of Tennessee, it follows that it was saved from repeal, and of course, that the guaranty contained in the twelfth section of the act of its incorporation was still continued. That the legislature so understood it receives additional confirmation from the consideration, that

this guaranty was expressly withdrawn in 1865. Why withdraw it then if it was withdrawn in 1858?

The effect of the repealing act of 1865 remains to be considered. It is true the State had the right at any time to withdraw its guaranty, but it is equally true that it must be done in such manner as not to impair the obligation of its contract with the note-holders of the bank. That this repealing act operated on all the issues of the bank after its date cannot be doubted, but the question with which we have to deal is, what effect did it have on the notes of the bank issued prior to its passage? It is conceded that these plaintiffs are entitled to the relief they ask, if the defendant was obliged to receive the notes which were tendered. The tender was made in the notes of the bank, issued prior to the 6th day of May, 1861, which were in conformity to its charter, and were payable to bearer. It does not appear when the notes came to the hands of the plaintiffs—whether before or after the repealing act—but it is a fair presumption, in the absence of any averment to the contrary, that it was after the date of that act.

It is insisted, as the bank during the rebellion was under the control of the usurping government, and was used by it for unlawful purposes, that it should have been stated that the notes tendered were the lawful issues of the bank. But it would seem the pleader had this state of things in his mind, and wished to avoid the issue it involved, for he avers that the notes were issued prior to the 6th day of May, 1861, the time when the State endeavored to sever its relations with the Union. The presumption is that the bank, before that time, issued its notes properly; and, in addition, it is stated, as we have seen, that they were issued in conformity with the twelfth section of its charter. It follows from this statement, necessarily, that they were the lawful issues of the bank. If the defendant wished to contest this point he should have answered, and not by his pleading, admitted the truth of the petition and all legal inferences that could be drawn from it.

This case is, therefore, not embarrassed by the changed

relation of the State after 1861; and the discussion of the principles which settle this case are not intended by the court to apply to the issues of this bank while under the control of the insurgents, because such a case is not before us, and it will be time enough to decide the important questions which it would present when it arises, if it ever should arise.

It is contended that the repealing act took from those persons who did not at the time hold the paper of the bank, the right to acquire it afterwards, and use it to discharge their debts to the State.

This construction of the contract would limit the obligation to the person, and withdraw it from the paper. If, as we have endeavored to show, the guaranty attached to the paper itself, and could not be withdrawn from it, then it follows that the notes in circulation at the time of the repeal are not affected by it, and carry with them the pledge of the State to be received in payment of taxes by every *bona fide* holder.

It would seem to be unnecessary to discuss any further the principles which lie at the foundation of this case, as they were settled in *Woodruff* v. *Trapnall*, heretofore decided by this court. The mere statement of that case will show its similarity to this. In 1836, the State of Arkansas, in the charter of a bank (owned and controlled by the State), declared that the notes of the institution should be received in payment of all debts due the State. Some years afterwards this provision of the charter was repealed. After its repeal, Trapnall, acting in behalf of the State, sued out an execution upon a judgment which the State had obtained against Woodruff, a defaulting treasurer. Woodruff met the demand of the writ by a tender (which was refused) of the notes of the bank, but whether he got these notes before or after the repealing act was passed, did not appear. On this state of things, Woodruff, to test his right to pay his debt in the paper of the bank, applied for a writ of mandamus against Trapnall, which was denied him by the State court. The case was brought here, as this is, under the twenty-fifth section of the Judiciary Act, and this court held that the

undertaking of the State to receive the notes of the bank, constituted a contract between the State and the holders of the notes, which the State was not at liberty to break; and that the tender of notes issued prior to the repealing act was good. It was also held, that it made no difference whether the debtor had the notes in his possession when the repealing act was passed or not.

It will thus be seen that *Woodruff* v. *Trapnall*, and this case, in all important features, are alike. .

An attempt has been made to distinguish the cases, because in the Tennessee bank trust funds were embarked in the enterprise; but if the State thought proper to use them in this manner, it took care to pledge its faith to supply any deficiency that should arise through the mismanagement of the bank. It is difficult to see how the employment of these funds made the bank any less a State institution, for it was created expressly for the benefit of the State, who had the exclusive management of it, and agreed to support it. But if we concede that the State did wrong in using these funds in banking, can that *tend* even to justify her in breaking her promise to the note-holders of the bank?

Enough has been said to show, as the result of our views, that section 28 of the charter of the Bank of Tennessee constituted a contract with the holders of the notes of the bank, and that it was not in the constitutional power of the legislature to repeal the section so as to affect the notes which, at the time, were in circulation.

JUDGMENT reversed, and the cause remanded, with directions to enter a judgment

AWARDING THE WRIT OF MANDAMUS.