Keith *v.* Clarke.

JOHN Y. KEITH *v.* E. A. CLARKE, Tax Collector.

1. PRACTICE AND PLEADINGS. *Special verdicts.* The practice of allowing juries to return a special verdict in the event they cannot agree on a general verdict, has frequently been followed in the courts of this State, and is not without precedent or authority.

2. THE STATE. *Now and forever. Perpetual succession and identity.* The entity of a State was not destroyed by the act of secession, or in any way subverted by the war. There is no such thing known to our system as the destructibility of a State. The legality of an act or contract is not, therefore, to be determined by its date or the period in the existence of the State when it was done, but in the quality of the act or contract.

Keith *v.* Clarke.

3. BANK OF TENNESSEE. *Notes issued during the war.* It is just as obligatory on the State to receive in payment of "taxes and other moneys due the State" the circulating notes of the Bank of Tennessee issued after May 6th, 1861, as those issued prior thereto, provided the same were not issued in support of the rebellion.

4. SAME. *Notes. Torbett issue.* The law presumes that the Bank of Tennessee put in circulation the "Torbett issue" in the ordinary course of its business for lawful purposes. The law will not presume the illegality of a transaction.

5. SAME. *Notes. In aid of rebellion. Burden of proof.* In this case it must be shown by the defendant that the notes tendered by the plaintiff to the defendant in payment of his taxes were issued by the Bank of Tennessee in aid of rebellion. It is not incumbent on defendant to show that the bills tendered him were issued in aid of the rebellion under contract or agreement, expressed or implied, with the State.

6. BANK OF TENNESSEE. *Private corporation.* The Bank of Tennessee and the State are different entities, and although the State owned all the stock and controlled the management of the bank, it was merely a private corporation.

7. SAME. *Constitutional law.* Corporations and individuals are not within the inhibition of that part of the Fourteenth Amendment of the Constitution of the United States prohibiting any State from assuming or promising to pay any debt or obligation incurred in aid of the rebellion.

8. SAME. *Notes. Receivable for taxes, when.* If, upon a new trial, it is found that the bills in question were not issued in aid of the rebellion, then the State is bound to accept them in payment of taxes, but if found to be issued in aid of the rebellion, the State cannot receive them under the Fourteenth Amendment.

---

FROM MADISON.

---

Appeal in error from the Common Law Court of Madison County. L. B. HORRIGAN, J.

JOHN H. SAVAGE, S. F. WILSON and JOHN W. BUFORD for Clarke.

Keith *v.* Clarke.

A. S. COLYAR and CAMPBELL & JACKSON for Keith.

JOSIAH PATTERSON, Sp. J., delivered the opinion of the Court.

Appeal from the Law side of the Common Law and Chancery Court of Madison County.

The Bank of Tennesse was chartered in the year 1838. The 12th section of its charter reads thus: " Be it enacted, that the bills or notes of the said corporation originally made payable, or which shall have become payable on demand, in gold or silver coin, shall be receivable at the treasury of this State and by all tax collectors and other public officers, in all payments for taxes or other moneys due the State."

It was settled in the case of *Furman* v. *Nichol*, 8 Wall., 44, that this provision in the charter was a contract within the meaning of the Constitution of the United States, between the State of Tennessee and every holder of the issues of the bank, and that it was obligatory on the State to receive the same in payment of taxes or other moneys due the State.

The State of Tennessee, on the 6th day of May, 1861, adopted what is known as the Act of Secession by which it attempted to dissolve its relations with the government of the United States. After the 6th day of May, 1861, the general government was in the attitude of waging war against

the State to coerce it to remain in the Union, and the State was in the attitude of armed resistance.

In the case of Furman v. Nichol the Court held that the circulating notes of the bank issued prior to this attempted disruption and the inauguration of hostilities between the State and general government were within the terms of that decision, but the Court expressly withheld any opinion as to such notes as were put in circulation by the bank after that date.

The defendant, Clarke, as Tax Collector of Madison County, demanded of Plaintiff Keith the State tax assessed against him for 1874, and Keith tendered in payment two notes of the Bank of Tennessee, each of the denomination of twenty dollars, which were issued and put into circulation subsequent to the 6th of May, 1861. These notes constituted a part of what is known in the judicial history of the State as the "Torbett issue" of the Bank of Tennessee. Clarke refused to accept said notes in payment of the tax, and thereupon Keith protested and paid the same in lawful money of the United States. Keith then within thirty days thereafter instituted this suit before a justice of the peace under the Act of the General Assembly, approved March 21, 1873, entitled "an Act to facilitate the collection of revenues," to recover the money so paid. The case was appealed to the Law side of the Common Law and Chancery Court of said County, where the case was tried

before a jury. The Court charged the jury in substance, that if the notes tendered by Keith, in payment of his taxes, were issued after the 6th day of May, 1861, and while the State was in hostility to the government of the United States, then they were illegal and void as against public policy, and not receivable in payment of taxes or other moneys due the State. A verdict for defendant resulted and the case was appealed to this Court, and without delivering an opinion this Court affirmed the judgment. A federal question being suggested, the case was then removed by writ of error to the Supreme Court of the United States, where the judgment of this Court was reversed and the cause remanded. This Court then remanded the case to the Law side of said Common Law and Chancery Court, where the case was again tried before a jury, and upon the special findings of the jury a judgment was rendered against the defendant. From this judgment the defendant has appealed to this Court. As the jury did not bring in a general verdict on the issues joined in the pleading, it is unnecessary to consider the correctness of the charge of the learned Judge, who presided at the trial, and neither is it material to consider, further than is herein noticed, the correctness of the many rulings made by him on the pleadings.

Among other things, the Court sustained a demurrer to a plea of the statute of limitation, and we think, correctly. This Court has repeatedly

Keith *v.* Clarke.

held that statutes of limitation do not apply to bank bills. It is so held at the present term of the Court in the case of *Marr* v. *The Bank of West Tennessee.*

The Court overruled a motion to dismiss for want of jurisdiction, and sustained a demurrer to a plea to the jurisdiction. To this, we think, no exception can be taken. This suit falls within the class of actions provided for in the Act approved March 21, 1873: *Tennessee* v. *Sneed*, 6 Otto, 69. If the notes were not issued in aid of the rebellion it is manifest that it was the duty of the defendant, as Tax Collector, to receive the bills tendered by plaintiff in payment of his taxes: *Furman* v. *Nichol*, 8 Wall., 44. Any law directing him to do otherwise impairs the obligation of the contract of the State as expressed in the 12th section of the Bank's charter, and is therefore unconstitutional. It has been insisted with much earnestness that the Court erred in directing, over the objection of the defendant, the jury to bring in a special verdict or finding of facts, in the event they could not agree upon a general verdict. We see no objection to this practice. It has been frequently followed in the courts of this State, and is not without precedent or authority: Tidd's Practice, p. 897.

The finding of facts by the jury, as recorded in the special verdict, is in substance: that the bills of the bank, tendered by plaintiff to defendant, in payment of his taxes, were regularly issued

by the proper officers of the Bank and put in circulation; that defendant, as collector, refused to accept the same, and that plaintiff protested against such refusal, and thereupon paid his taxes in the lawful money of the United States; that he instituted this suit to recover the money so paid within thirty days thereafter; that there was no evidence as to what contract or consideration these identical bills were issued or paid by the bank; that the plaintiff purchased the bills in open market, without knowledge that the same were issued in aid of the rebellion, and that the Torbett issue of the bank was received and paid in the ordinary course of business by the bank and its branches.

As to whether any contract, arrangement or agreement was entered into between the Governor of the State and "Military Board," or either of them on the one part, and the Bank of Tennessee in its corporate capacity on the other that the "Torbett issue" of the bank should be issued and put in circulation in aid of the rebellion against the Government of the United States, and if so, whether it was actually issued and put out by the bank for that purpose, the jury failed to agree, and announced their disagreement in the special verdict.

In considering the correctness of the judgment rendered on this verdict, the Court must necessarily assume as a fact, without, however, deciding the question, that the "Torbett issue," of which the bills involved in this suit are a part, were

Keith *v.* Clarke.

under a contract or agreement between the State and the Bank, actually issued and put in circulalation by the bank in aid of the rebellion. If this fact, taken in connection with the special findings of the jury, is immaterial, then the judgment should stand, otherwise, this Court will award a new trial.

It is settled by the Supreme Court of the United States in this case that the entity of the State of Tennessee was not, during the war, or at any other time, destroyed or in any way subverted. Whether peacefully occupying her place in the family of states, or in open rebellion against the government of the United States, her identity has been the same. Whatever difference of opinion may have formerly existed, it is now authoritatively settled by repeated adjudications of the Supreme Court of the United States, that the states constituting what is known as the Southern Confederacy, had no legal or constitutional right to withdraw from the Federal Union, and the result of the war proved that they were unable by force of arms to disrupt their relations with the general government. There is no such thing known to our system as the destructibility of a State. Justice Miller, in the opinion delivered by the Supreme Court of the United States, in this case, says: "The political society, which in 1796, became a State of the Union by the name of the State of Tennessee, is the same which is now represented as one of those states in the Congress of

the United States. Not only is it the same body politic now, but it has always been the same. There has been perpetual succession and perpetual identity. There has, from that time, always been a State of Tennessee, and the same State of Tennessee. Its executive, its legislative, its judicial departments have continued without interruption, and in regular order. It has changed, modified and reconstructed its organic law, or State Constitution more than once. It has done this before the rebellion, during the rebellion and since the rebellion. And it was always done by the collective authority, and in the name of the same body of people constituting the political society known as the State of Tennessee."

The logical deduction from this premise is, that the legality of an act or contract of the State of Tennessee, is not to be determined by its date or the period in the existence of the State when it was made or done, but on the quality of the act or contract. It was unlawful for the State of Tennessee to engage in war against the Government of the United States, and whatever she did in carrying on or promoting the war, or in furtherance of her hostile aims and purposes, was and is, in a legal sense, void. On the other hand, all the legislation of the State, the judgments of its courts and the acts of its Executive, in short, every thing done by any of the departments of the State Government, not in violation of the Constitution of the United States, or in

aid of the rebellion, is just as legal and just as much under constitutional protection during the war as at any other period during the history of the State.

It logically follows, and the Supreme Court of the United States so decides, that it is just as obligatory on the State to receive in payment of "taxes, or other moneys due the State," the circulating notes of the Bank of Tennessee issued after May 6th, 1861, as those issued prior thereto, provided the same were not issued in support of the rebellion.

It follows, then, that the whole question is resolved into one of fact to be determined by a jury according to the ordinary rules of evidence.

The law presumes that the Bank of Tennessee put into circulation the "Torbett issue" in the ordinary course of its business for lawful purposes. The law will not presume the illegality of a transaction, but the illegality must be made to appear by proof.

The direct question to be resolved by the jury in this case is, were the two bills tendered by the plaintiff to the defendant in payment of his taxes issued by the Bank of Tennessee in aid of the rebellion? This may be shown by proof that the identical bills were issued in aid of the rebellion, or that the class of notes to which they belong were issued and circulated in aid of the rebellion. In either case the burden of proof is on the defendant.

It would not be sufficient to show that the issues of the bank in circulation on the 6th day of May 1861, were exhausted in the purchase of "Tennessee war bonds," and that thereby it became necessary for the bank to put in circulation the "Torbett issue" in order to properly carry on its business, for the necessity of doing an act altogether legal may grow out of an act done by the same person, which is altogether illegal.

On the other hand, we do not think it incumbent on the defendant to show by proof that the two bills tendered to him by the plaintiff were actually issued by the bank in aid of the rebellion under a contract or agreement, either expressed or implied, with the State. Had the bank issued its notes and put them in circulation in aid of the rebellion without the knowledge, consent or procurement of the State, such a transaction would be just as obnoxious to public policy as if they had been issued under an express contract with the State. Suppose they had been issued and delivered by the bank, either voluntarily or for a consideration, to the Confederate Government, to enable it more effectually to prosecute the war, would not such a transaction have been as flagrantly illegal as to have issued them to the State for the same purpose under an express contract?

We have already announced that because of the disagreement of the jury we are to assume for the purpose of this opinion that the "Torbett

issue," of which the two bills in question constitute a part, was issued and put in circulation in aid of the rebellion. As the jury failed to agree upon the exact question upon which the case must be determined, a reversal will necessarily follow, unless there is something in the special findings which takes the case without the general rule.

The bank and the State are entirely different entities. While the State owned all the stock in the bank, appointed its officers, received the benefit of the profits it made, and dictated its management, yet it was merely a private corporation, and it is to be held and treated accordingly. This was expressly determined by this Court in the case of *Watson* v. *The Bank.*

In considering the legality or validity of any act or contract of the bank, we are to judge of it precisely as we would of a private individual. That public policy which repels from the courts parties who seek the enforcement of contracts prohibited by law or founded in immorality, is only intended for the guilty, and by no means embraces within its reason or operation innocent persons who are interested in such contracts.

The facts set out in the special verdict of the jury conclusively show that the plaintiff is an innocent holder, who purchased these notes in open market, without knowledge on his part that they were issued in aid of the rebellion, and that, too, after the "Torbett issue," of which they are a part, was placed in circulation and again received

and paid out by the bank and its branches in due course of business. It necessarily follows that the bank could' not resist the payment of these bills in the hands of the plaintiff, and that he can enforce their payment out of its assets. This is in harmony with the conclusions of this Court in the case of *Watson* v. *The Bank*, and the doctrine has been fully recognized by the Supreme Court of the United States: *Hanauer* v. *Doane*, 12 Wall., 332; *Hanauer* v. *Woodruff*, 15 Wall., 349.

Does the same rule apply to the State? It is declared in the Fourteenth Amendment to the Constitution of the United States: "That neither the United States nor any State shall assume or pay any debt .or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slaves, but all such debts, obligations and claims shall be held illegal and void."

It will be observed that corporations and individuals are not within the inhibitions of this clause of the Constitution.

In determining whether a corporation or private person is liable on a contract made in aid of the rebellion, we must look to the requirements of public policy, and be governed by the established rules of common law. In determining whether we will give effect to the contract of a State made in aid of the rebellion, we must look beyond the ordinary rules of law to the provision of the Con-

Keith *v*. Clarke.

stitution of the United States, declaring such contracts void. In this clause we find no exception. The inhibition is direct, positive, and without reservation as to innocent holders.

A bond of the State of Tennessee, made and executed in the usual way, if issued in aid of the rebellion, would be just as obnoxious to this clause of the Constitution in the hands ot a holder however innocent, as a bond reciting the fact on its face that it was made and executed to enable the State to carry on war against the United States. Its language is most comprehensive and was intended to absolutely prohibit, in any event, the States from carrying out, or in any way paying any such debt or executing any such contract.

The 12th section of the Bank's charter, as already stated, is a contract of the State within the protection of the Constitution of the United States. It is in the nature of a continuing guaranty. It took effect the moment each circulating note was issued and delivered by the bank to the holder thereof. Each and every bill of the bank issued for lawful purposes, and in due course of business is embraced in this guaranty, and the obligation will rest upon the State to receive the same in payment of taxes or other moneys due it. Should it appear, however, on another trial, that the two bills of the bank tendered by plaintiff to defendant in payment of his taxes, were issued and put in circulation in aid of the rebellion, then the 12th section of Bank's charter, as to these bills, would

not be within the protection of the Constitution of the United States, and the contract of the State to receive these particular bills in payment of its taxes or other moneys due it, would be to that extent void under the 14th amendment.

It results from the conclusions we have reached, that the judgment must be reversed and the cause remanded for a new trial.

## CLARKE v. KEITH.

McFARLAND, J., delivered the following opinion:

The question whether the particular notes in controversy were issued and put in circulation in aid of the rebellion was material. If this fact had been found by the jury it would not have been met by the finding that the plaintiff bought the notes in open market without notice. If the notes were void upon grounds of public policy, because made and put in circulation in aid of the rebellion, then they would be void in whosesoever hands they might come.

The jury failed to agree as to whether the " Torbett issue," of which the notes in controversy were a part, were made and issued for an illegal purpose. They do find that there was no proof directly in reference to these particular notes.

It is clear that the question was as to these particular notes, and a finding of illegality that did not include these particular notes would be

Clarke *v.* Keith.

bad. But I do not think it would be necessary to show the illegality by proof and a finding *pointing out these* particular *notes* specifically. A finding that the *whole issue* was void, supported by sufficient proof, would include these particular notes, and would not be met by finding that there was no proof specifically pointing out these notes. If there was no evidence upon which the jury could have found the whole Torbett issue void, then there would be no ground for reversal.

Whatever may be said upon the effect or sufficiency of the proof on this subject, I cannot say that there was no proof for the consideration of the jury. Whatever this or any other Court may have decided upon similar evidence, it was a question for the jury in this case, the party having the right to trial by jury.