## KEITH v. CLARK.

1. Where a case has been decided in an inferior court of a State on a single point which would give this court jurisdiction, it will not be presumed here that the Supreme Court of the State decided it on some other ground not found in the record or suggested in the latter court.

2. The State of Tennessee having, in 1838, organized the Bank of Tennessee, agreed, by a clause in the charter, to receive all its issues of circulating notes in payment of taxes; but, by a constitutional amendment adopted in 1865, it declared the issues of the bank during the insurrectionary period void, and forbade their receipt for taxes. *Held*, that the amendment was in conflict with the provision of the Constitution of the United States against impairing the obligation of contracts.

3. There is no evidence in this record that the notes offered in payment of taxes by the plaintiff were issued in aid of the rebellion, or on any consideration forbidden by the Constitution or the laws of the United States; and no such presumption arises from any thing of which this court can take judicial notice.

4. The political society which, in 1796, was organized and admitted into the Union by the name of Tennessee, has to this time remained the same body politic. Its attempt to separate itself from that Union did not destroy its identity as a State, nor free it from the binding force of the Constitution of the United States.

5. Being the same political organization during the rebellion, and since, that it was before, — an organization essential to the existence of society, — all its acts, legislative and otherwise, during the period of the rebellion are valid and obligatory on the State now, except where they were done in aid of that rebellion, or are in conflict with the Constitution and laws of the United States, or were intended to impeach its authority.

6. If the notes which were the foundation of this suit had been issued on a consideration which would make them void for any of the reasons mentioned, it is for the party asserting their invalidity to set up and prove the facts on which such a plea is founded.

ERROR to the Supreme Court of the State of Tennessee.

The facts are stated in the opinion of the court.

*Mr. Philip Phillips* and *Mr. George Hoadly* for the plaintiff in error.

*Mr. J. B. Heiskell, contra.*

MR.. JUSTICE MILLER delivered the opinion of the court.

The plaintiff in error, who was plaintiff below, sued the defendant for the sum of $40, which he had paid in lawful money under protest for taxes due the State of Tennessee, after he had tendered to the defendant that sum in the circulating notes of the Bank of Tennessee, which defendant refused to receive.

The suit was commenced before a justice of the peace, taken by appeal to the Common-Law Chancery Court of Madison County, and from there to the Supreme Court of Tennessee, and by writ of error from this court it is now before us for review.

In all the trials in the State courts, judgment was rendered against the plaintiff. The jurisdiction of this court is denied again, though it was affirmed in the analogous cases of *Woodruff* v. *Trapnall*, 10 How. 190, and *Furman* v. *Nichol*, 8 Wall. 44.

As the same facts are involved in the question of jurisdiction and the issue on the merits, it may be as well to state them.

They appear in a bill of exceptions taken at the trial on the first appeal, which was a trial *de novo* before a jury. The defendant was a collector of taxes, to whom plaintiff had tendered $40 of the bills of the Bank of Tennessee, which, with other lawful money tendered at the same time, was the amount due. The offer of plaintiff was founded on the twelfth section of the charter of the bank, enacted in 1838 by the legislature of the State, which reads thus : —

"Be it enacted that the bills or notes of the said corporation originally made payable, or which shall have become payable on demand, in gold or silver coin, shall be receivable at the treasury of this State, and by all tax-collectors and other public officers, in all payments for taxes or other moneys due to the State."

It was proved that the bills were issued subsequently to May 6, 1861, and were known as the "Torbet or new issue," and were worth in the brokers' market about twenty-five cents on the dollar.

The court charged the jury that if the notes tendered were issued subsequently to May 6, 1861, and during the existence of the State government established at that date in hostility to

the government of the United States, then defendant was not legally bound to receive them in payment of plaintiff's taxes. And the reason given for this was, that while the Constitution of the United States protected the contract of the section of the charter we have cited from repudiation by State legislation as to notes issued prior to the act of secession of May 6, 1861, it conferred no such protection as to notes issued while the State was an insurrectionary government; and that conse-. quently the provisions of sect. 6 of the schedule to the constitutional amendment of 1865, which declared that all the notes of the bank issued after the date above mentioned were null and void, and forbade any legislature to pass laws for their redemption, was a valid exercise of State authority. On this instruction the jury found a verdict for the defendant.

In the Supreme Court the judgment rendered on this verdict was affirmed, without any opinion or other evidence of the grounds on which it was so affirmed.

There can be no question that the charge of the trial judge to the jury decided against the plaintiff in error a question which gives this court jurisdiction; and this is admitted by counsel, who ask us to dismiss the writ of error.

The ground assumed in support of the motion is, that we ought to presume that the Supreme Court did not decide the question which the court below did, but affirmed the judgment, on the ground that, by the laws of Tennessee, no suit could be brought against the State or against the collector of taxes, and that the justice of the peace who first tried the case, and the court to which the appeal was taken, had no jurisdiction. It would follow, say counsel, that as this was a question of State law, it could not be reviewed in this court.

The answers to this are several and very obvious.

1. Where an appellate court decides a case on the ground that the inferior court had no jurisdiction, it in some mode indicates that it was not a decision on the merits, to prevent the judgment being used as a bar in some court which might have jurisdiction. *Barney* v. *Baltimore City*, 6 Wall. 280; *House et al.* v. *Mullen*, 22 id. 42; *Kendig* v. *Dean, supra*, p. 423.

2. In *Tennessee* v. *Sneed* (96 U. S. 69), this court decided that the courts of Tennessee did have the jurisdiction which

this suggestion denies them; and we will not presume, without very strong reason for it, that the Supreme Court of Tennessee disagreed with this court on that point.

.3. There is not the slightest evidence in the record, nor any reason to be drawn from it, to believe that the court decided any such question. It nowhere appears that it was raised. Nothing like it is found in the bill of exceptions. There is no plea to the jurisdiction, or motion to dismiss for want of it.

And we are bound by every fair rule of sound construction to hold that the Supreme Court, in affirming the judgment of the court below, did it on the only ground on which that court acted, or which was raised by the record.

That question was, whether the twelfth section of the charter of the bank constituted a contract which brought the issues of the bank after the 6th of May, 1861, within the protective clause of the Constitution of the United States against impairing the obligation of contracts by State laws. Of that question this court has jurisdiction, and we proceed to its consideration.

In *Furman* v. *Nichol* (*supra*), the twelfth section of the charter of the bank — the same now under consideration — was held to constitute a contract between every holder of the circulating notes of the bank and the State of Tennessee, that the State would receive the notes in payment of taxes at their par value. And it was held that the same provision of the State Constitution of 1865, which is relied on here, was void, as impairing the obligation of that contract.

The case of *Woodruff* v. *Trapnall* (*supra*) was referred to as being perfect in its analogy, both in the character of the bank and its relation to the State, and the contract to receive its notes in payment of taxes. In *Furman* v. *Nichol*, however (which is the identical case before us, except that in the former case the notes were issued prior to May 6, 1861), the court, out of abundant caution, said, that it did not consider or decide any thing as to the effect of the civil war on that contract, or to notes issued subsequently to that date. We are invited now to examine that point, and to hold that as to all such notes the twelfth section creates no valid contract.

In entering upon this inquiry we start with the proposition,

that unless there is something in the relation of the State of Tennessee and the bank, after the date mentioned, to the government of the United States, or something in the circumstances under which the notes now sued on were issued, that will repel the presumption of a contract under the twelfth section, or will take the contract out of the operation of the protecting clause of the Federal Constitution; this court has established already that there was a valid contract to receive them for taxes, and that the law which forbade this to be done is unconstitutional and void.

Those who assert the exception of these notes from the general proposition are not very well agreed as to the reasons on which it shall rest, and we must confess that, as they are presented to us, they are somewhat vague and shadowy. They may all, however, as far as we understand them, be classed under three principal heads.

1. The first is to us an entirely new proposition, urged with much earnestness by the counsel who argued the case orally for the defendant.

It is, in substance, that what was called the State of Tennessee prior to the 6th of May, 1861, became, by the ordinance of secession passed on that day, subdivided into two distinct political entities, each of which was a State of Tennessee. One of them was loyal to the Federal government, the other was engaged in rebellion against it. One State was composed of the minority who did not favor secession, the other of the majority who did. That these two States of Tennessee engaged in a public war against each other, to which all the legal relations, rights, and obligations of a public war attached. That the government of the United States was the ally of the loyal State of Tennessee, and the confederated rebel States were the allies of the disloyal State of Tennessee. That the loyal State of Tennessee, with the aid of her ally, conquered and subjugated the disloyal State of Tennessee, and by right of conquest imposed upon the latter such measure of punishment and such system of law as it chose, and that by the law of conquest it had the right to do this. That one of the laws so imposed by the conquering State of Tennessee on the conquered State of Tennessee was this one, declaring that the

issues of the bank during the temporary control of affairs by the rebellious State was to be held void; and that, as conqueror and by right of conquest, the loyal State had power to enact this as a valid law.

It is a sufficient answer to this fanciful theory that the division of the State into two States never had any actual existence; that, as we shall show hereafter, there has never been but one political society in existence as an organized State of Tennessee, from the day of its admission to the Union in 1796 to the present time. That it is a mere chimera to assert that one State of Tennessee conquered by force of arms another State of Tennessee, and imposed laws upon it; and, finally, that the logical legerdemain by which the State goes into rebellion, and makes, while thus situated, contracts for the support of the government in its ordinary and usual functions, which are necessary to the existence of social life, and then, by reason of being conquered, repudiates these contracts, is as hard to understand as similar physical performances on the stage.

2. The second proposition is a modification of this, and deserves more serious attention. It is, as we understand it, that each of the eleven States who passed ordinances of secession and joined the so-called Confederate States so far succeeded in their attempt to separate themselves from the Federal government, that during the period in which the rebellion maintained its organization those States were in fact no longer a part of the Union, or, if so, the individual States, by reason of their rebellious attitude, were mere usurping powers, all of whose acts of legislation or administration are void, except as they are ratified by positive laws enacted since the restoration, or are recognized as valid on the principles of comity or sufferance.

We cannot agree to this doctrine. It is opposed by the inherent powers which attach to every organized political society possessed of the right of self-government; it is opposed to the recognized principles of public international law; and it is opposed to the well-considered decisions of this court.

"Nations or States," says Vattel, "are bodies politic, societies of men united together for the promotion of their mutual safety and advantage by the joint efforts of their combined strength.

Such a society has her affairs and her interests. She deliberates and takes resolutions in common, thus becoming a moral person who possesses an understanding and a will peculiar to herself, and is susceptible of obligations and rights." Law of Nations, sect. 1.

Cicero and subsequent public jurists define a State to be a body political or society of men united together for the purpose of promoting their mutual safety and advantage by their combined strength. Wheaton, International Law, sect. 17. Such a body or society, when once organized as a State by an established government, must remain so until it is destroyed. This may be done by disintegration of its parts, by its absorption into and identification with some other State or nation, or by the absolute and total dissolution of the ties which bind the society together. We know of no other way in which it can cease to be a State. No change of its internal polity, no modification of its organization or system of government, nor any change in its external relations short of entire absorption in another State, can deprive it of existence or destroy its identity. Id., sect. 22.

Let us illustrate this by two remarkable periods in the history of England and France.

After the revolution in England; which dethroned and decapitated Charles I., and installed Cromwell as supreme, whom his successors called a usurper; after the name of the government was changed from the Kingdom of England to the Commonwealth of England; and when, after all this, the son of the beheaded monarch came to his own, treaties made in the interregnum were held valid, — the judgments of the courts were respected, and the obligations assumed by the government were never disputed.

So of France. Her bloody revolution, which came near dissolving the bonds of society itself, her revolutionary directory, her consul, her Emperor Napoleon, and all their official acts, have been recognized by the nation, by the other nations of Europe, and by the legitimate monarchy when restored, as the acts of France, and binding on her people.

The political society which in 1796 became a State of the Union, by the name of the State of Tennessee, is the same

which is now represented as one of those States in the Congress of the United States. Not only is it the same body politic now, but it has always been the same. There has been perpetual succession and perpetual identity. There has from that time always been a State of Tennessee, and the same State of Tennessee. Its executive, its legislative, its judicial departments have continued without interruption and in regular order. It has changed, modified, and reconstructed its organic law, or State Constitution, more than once. It has done this before the rebellion, during the rebellion, and since the rebellion. And it was always done by the collective authority and in the name of the same body of people constituting the political society known as the State of Tennessee.

This political body has not only been all this time a State, and the same State, but it has always been one of the United States, — a State of the Union. Under the Constitution of the United States, by virtue of which Tennessee was born into the family of States, she had no lawful power to depart from that Union. The effort which she made to do so, if it had been successful, would have been so in spite of the Constitution, by reason of that force which in many other instances establishes for itself a status, which must be recognized as a fact, without reference to any question of right, and which in this case would have been, to the extent of its success, a destruction of that Constitution. Failing to do this, the State remained a State of the Union. She never escaped the obligations of that Constitution, though for a while she may have evaded their enforcement.

In *Texas* v. *White* (7 Wall. 700), the first and important question was, whether Texas was then one of the United States, and as such capable of sustaining an original suit in this court by reason of her being such State. And this was at a time when Congress had not permitted her, after the rebellion, to have representatives in either house of that body.

Mr. Chief Justice Chase, in delivering the judgment of the court on this question, says : " The ordinance of secession, adopted by the convention and ratified by a majority of the citizens of Texas, and all the acts of her legislature intended to give effect to that ordinance, were absolutely null. They were utterly without operation in law. The obligations of the State,

as a member of the Union, and of every citizen of the State, as a citizen of the United States, remained perfect and unimpaired. It certainly follows that the State did not cease to be a State, nor her citizens to be citizens, of the Union. If this were otherwise, the State must have become foreign, and her citizens foreigners. The war must have ceased to be a war for the suppression of rebellion, and must have become a war for conquest and subjugation. Our conclusion, therefore, is, that. Texas continued to be a State, and a State of the Union, notwithstanding the transactions to which we have referred."

In *White* v. *Hart* (13 id. 646), Mr. Justice Swayne, after a full consideration of the subject, states the result in this forcible language: "At no time were the rebellious States out of the pale of the Union. . . . Their constitutional duties and obligations were unaffected, and remained the same." And he shows by reference to the formula used in the several reconstruction acts, as compared with those for the original admission of new States into the Union, that in regard to the States in rebellion there was a simple recognition of their restored right to representation in Congress, and no readmission into the Union.

These cases, and especially that of *Texas* v. *White*, have been repeatedly cited in this court with approval, and the doctrine they assert must be considered as established in this forum at least.

If the State of Tennessee has through all these transactions been the same State, and has been also a State of the Union, and subject to the obligations of the Constitution of the Union, it would seem to follow that the contract which she made in 1838 to take for her taxes all the issues of the bank of her own creation, and of which she was sole stockholder and owner, was a contract which bound her during the rebellion, and which the Constitution protected then and now, as well as before. Mr. Wheaton says: "As to public debts, — whether due to or from the State, — a mere change in the form of the government, or in the person of the ruler, does not affect their obligation. The essential power of the State, that which constitutes it an independent community, remains the same : its accidental form only is changed. The debts being contracted in the name of the State, by its authorized agents, for its public

use, the nation continues liable for them, notwithstanding the change in its internal constitution. The new government succeeds to the fiscal rights, and is bound to fulfil the fiscal obligations, of the former government." International Law, sect. 30. And the citations which he gives from Grotius and Puffendorf sustain him fully.

We are gratified to know that the Supreme Court of the State of Tennessee has twice affirmed the principles just laid down in reference to the class of bank-notes now in question. In a suit brought by the State of Tennessee, against this very bank of Tennessee, to wind up its affairs and distribute its assets, that court, in April, 1875, decreed, among other things, "that the acts by which it was attempted to declare the State independent, and to dissolve her connection with the Union, had no effect in changing the character of the bank, but that it had the same powers, after as before those acts, to carry on a legitimate business, and that the receiving of deposits was a part of such legitimate business." " That the notes of the bank issued since May 6, 1861, held by Atchison and Duncan, and set out in their answer, are legal and subsisting debts of the bank, entitled to payment at their face value, and to the same priority of payment out of the assets of the bank as the notes issued before May 6, 1861."

At a further hearing of the same case, in January, 1877, that court reaffirmed the same doctrine, and also held that the notes were not subject to the Statute of Limitations, and were not bound by it. *State of Tennessee* v. *The Bank of Tennessee*, not reported. This decision was in direct conflict with schedule 6 of the constitutional amendment of 1865, which declared all issues of the bank after May 6, 1861, void, and it necessarily held that the schedule was itself void as a violation of the Federal Constitution.

3. The third proposition on which the judgment of the courts of Tennessee is supported is, that the notes on which the action is brought were issued in aid of the rebellion, to support the insurrection against the lawful authority of the United States, and are therefore void for all purposes.

The principle stated in this proposition, if the facts of the case come within it, is one which has repeatedly been discussed

by this court. The decisions establish the doctrine that no promise or contract, the consideration of which was something done or to be done by the promisee, the purpose of which was to aid the war of the rebellion or give aid and comfort to the enemies of the United States in the prosecution of that war, is a valid promise or contract, by reason of the turpitude of its consideration.

In *Texas* v. *White* (*supra*), the suit was for the recovery of certain bonds of the United States which, previously to the war, had been issued and delivered to the State of Texas. During the rebellion the legislature of that State had placed these bonds in the hands of a military commission, and they were delivered by that committee to White and Childs, to pay for supplies to aid the military operations against the government. This court held that while the State was still a State of the Union, and her acts of ordinary legislation were valid, it was otherwise in regard to this transaction. As this is the earliest assertion of the doctrine in this court, and this branch of the opinion received the assent of all the members of the court but one, and has been repeatedly cited since with approval, we reproduce a single sentence from it: " It may be said," says the court, " perhaps with sufficient accuracy, that acts necessary to peace and good order among citizens, such, for example, as acts sanctioning and protecting marriage and the domestic relations, governing the course of descents, regulating the conveyance and transfer of property, personal and real, and providing remedies for injuries to person and estate, and other similar acts which would be valid if emanating from a lawful government, must be regarded in general as valid when proceeding from an actual though unlawful government; and that acts in furtherance or support of rebellion against the United States, or intended to defeat the just rights of citizens, and other acts of like nature, must, in general, be regarded as invalid."

In *Hanauer* v. *Doane* (12 Wall. 342), it was held that due-bills, given in purchase of supplies by a purchasing agent of the Confederate States, were void, though in the hands of a third party ; and in support of the judgment Mr. Justice Bradley said: " We have already decided, in the case of *Texas* v. *White,* that a contract made in aid of the late rebellion, or in

furtherance and support thereof, is void.    The same doctrine is laid down in most of the circuits, and in many of the State courts, and must be regarded as the settled law of the land."

The latest expression of the court on the subject was by Mr. Justice Field, without dissent, in *Williams* v. *Bruffy* (96 U. S. 176), in which the whole doctrine is thus tersely stated: "While thus holding that there was no validity in any legislation of the Confederate States which this court can recognize, it is proper to observe, that the legislation of these States stands on very different grounds.    The same general form of government, the same general laws for the administration of justice and the protection of private rights, which had existed in the State prior to the rebellion, remained during its continuance and afterwards.    As far as the acts of the States did not impair, or tend to impair, the supremacy of the national authority, or the just rights of the citizens under the Constitution, they are, in general, to be treated as valid and binding."    See *Horn* v. *Lockhart et al.*, 17 Wall. 570 ; *Sprott* v. *United States*, 20 id. 459.

There is, however, in the case before us nothing to warrant the conclusion that these notes were issued for the purpose of aiding the rebellion, or in violation of the laws or the Constitution of the United States.    There is no plea of that kind in the record.    No such question was submitted to the jury which tried the case.    The sole matter stated in defence, either by facts found in the bill of exceptions, or in the decree of the court, is that the bills were issued after May 6, 1861, while the State was in insurrection, and therefore come within the amended Constitution of 1865, declaring them void.    The provision of the State Constitution does not go upon the ground that the State bonds and bank-notes, which it declared to be invalid, were issued in aid of the rebellion, but that they were issued by a usurping government, — a reason which we have already demonstrated to be unsound.    Not only is there nothing in the Constitution or laws of Tennessee to prove that these notes were issued in support of the rebellion, but there is nothing known to us in public history which leads to this conclusion. The opinion of the Supreme Court, which we have already cited, states that the bank was engaged in a legitimate business at this time, receiving deposits, and otherwise performing the

functions of a bank; and though, as is abundantly evident, willing enough to repudiate these notes as receivable for taxes, that court held them to be valid issues of the bank, in the teeth of the ordinance declaring them void.

It is said, however, that considering the revolutionary character of the State government at that time, we must presume that these notes were issued to support the rebellion.

But while we have the Supreme Court of Tennessee holding that the bank during this time was engaged in a legitimate banking business, we have no evidence whatever that these notes were issued under any new law of the rebel State government, or by any interference of its officers, or that they were in any manner used to support the State government. If this were so, it would still remain that the State government was necessary to the good order of society, and that in its proper functions it was right that it should be supported.

We cannot infer, then, that these notes were issued in violation of any Federal authority.

On the other hand, if the fact be so, nothing can be easier than to plead it and prove it. Whenever such a plea is presented, we can, if it comes to us, pass intelligently on its validity. If issue is taken, the facts can be embodied in a bill of exceptions or some other form, and we can say whether those facts render the contract void. To undertake to assume the facts which are necessary to their invalidity on this record is to give to conjecture the place of proof, and to rest a judgment of the utmost importance on the existence of facts not found in the record, nor proved by any evidence of which this court can take judicial notice. We shall, when the matter is presented properly to us, be free to determine, on all the considerations applicable to the case, whether the notes that may be then in controversy are protected by the provision of the Constitution or not. And that is the only question of which, in a case like the present, we would have jurisdiction.

The judgment of the Supreme Court of Tennessee will, therefore, be reversed, and the case remanded to that court for further proceedings in accordance with this opinion; and it is

*So ordered.*

MR. CHIEF JUSTICE WAITE, MR. JUSTICE BRADLEY, and MR. JUSTICE HARLAN dissented.

MR. CHIEF JUSTICE WAITE. I am unable to give my assent to the judgment which has just been announced, and while concurring in much of what is said in the opinion of the majority of my brethren, am compelled to differ upon a single point, which, as I think, controls the decision of the case.

It is a conceded fact that the notes on which the suit is brought were issued by the bank while the State was in rebellion against the government of the United States. The bank, although organized for the transaction of a general banking business, was also the fiscal agent of the State. It was established in the name and for the benefit of the State, and the faith and credit of the State were pledged to give indemnity for all losses arising from any deficiency in the funds specifically appropriated as capital. The State was the only stockholder, and entitled to all the profits realized from the business.

It is an historical fact that the banks of the insurgent States, and especially those owned by the States, were used extensively in furtherance of the rebellion, and that all or nearly all their available funds were converted in one way or another into Confederate securities. None of the banks owned by the States survived the rebellion, and few were able to make any considerable showing of valuable assets.

At the close of the war, Congress saw fit to propose for adoption the fourteenth constitutional amendment, in which it was provided that "neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, . . . but all such debts, obligations, and claims shall be held illegal and void." This was done June 16, 1866 (14 Stat. 328), and the adoption of this and other amendments by the late insurgent States was afterwards made a condition to their admission to representation in Congress. Id. 429.

On the 26th of June, 1865, before this amendment was proposed, the people of Tennessee in convention assembled ordained that "all laws, ordinances, and resolutions of the usurped State governments, passed on or after the sixth day of May, 1861, pro-

viding for the issuance of State bonds, also all notes of the Bank
of Tennessee, or any of its branches, issued after the sixth day
of May, 1861, and all debts created or contracted in the name of
the State by said authority, are unconstitutional, null, and void,
and no legislature shall hereafter have power to pass any act
authorizing the payment of said bonds or debts, or providing for
the redemption of said notes." This goes somewhat beyond
the requirements of the Fourteenth Amendment, but to the ex-
tent it is a declaration that the debts of the insurgent State
government contracted in aid of the rebellion should not be
paid is certainly valid. On the 26th of July, 1866, Congress
gave it that effect in the resolution admitting the State "to
her relations to the Union." Id. 364.

Every law is presumed to be constitutional. We cannot
declare a State law, and especially when in the form of a con-
stitution, repugnant to the Constitution of the United States,
unless it is manifestly so. We ought not reverse the judgment
of a State court upon a question of Federal law, unless it is
clearly wrong. The decisions of the highest court of a State
are always entitled to respect in this tribunal, and should not
be overruled under our constitutional power of review, except
for imperative reasons.

If facts could exist that would support a law or a State con-
stitution, we must presume they did exist when the law was
passed or the constitution adopted, and that the action of the
legislature or the people was intended to apply to them.

If the bills of the Bank of Tennessee were in fact issued in
aid of the rebellion, they are void as obligations of the State.
So the Constitution of the United States as amended provides,
and so this court has decided in every case, where the question
was raised, that has come here since the war closed. As I
construe the ordinance of Tennessee, it is an authoritative
declaration, in an appropriate form, by the people of the State,
who were cognizant of the facts, that all the issues of the bank
after May 6, 1861, were in furtherance of the rebellion. In
this way the people, in effect, prohibited the tax-collectors and
officers of the State from receiving such issues in payment of
public dues. This drove the bill-holder to his suit under the act
of March 21, 1873, for the recovery of his money. To this suit

the State voluntarily submitted, for the purpose of having the validity of these obligations judicially determined, and in such a suit as, I think, the constitutional ordinance, taken in connection with known historical facts, is entitled at least to the weight of *prima facie* evidence that the declaration it impliedly makes is true. It is evidence that may be rebutted, but, until rebutted, sufficient to justify an officer in refusing to receive the bills as the obligations of the loyal people in payment of dues to the loyal government. If this were an application for a *mandamus* to compel the officer to receive the bills, and his answer was that the bills had been issued in aid of the rebellion, and he was prohibited by the Constitution of the State from receiving them, I cannot but think his answer would be deemed sufficient until overcome by proof. But the statutory remedy which is now being used is only a substitute for that by *mandamus ;* and when the defendant, who is a tax-collector, sets up the Constitution of his State as his defence, and shows that the obligations sued upon were incurred while the State was engaged in rebellion against the United States, I think he, at least, puts upon the holder the burden of showing that they were not incurred in aid of the rebellion. The authoritative declarations of the people of a State, made in an appropriate manner under the forms of law, ought to be presumed to be true.

Suppose this were a suit upon a bond of the State issued during the rebellion, would it be insisted that we should reverse the judgment of the State court because it decided upon the faith of the constitutional ordinance that no recovery could be had without proof that the bond was issued for lawful purposes, and not in aid of the Confederacy? Clearly not, I think; and if not, why apply a different rule to suits upon these bills as State obligations incurred during the same time, and capable of being used for the same purposes. This is thought by some of my brethren to require the plaintiff in such an action to prove a negative before he can recover, but in my judgment it only requires him to overcome a *prima facie* case that has been made against him. If a State Constitution is not to be presumed to rest on facts which will support it, rather than such as will not, it seems to me nothing can be presumed.

If the bills of this bank put out after May 6, 1861, were issued in aid of the rebellion; the constitutional ordinance in question, so far as it relates to them, is valid, and can stand; but if not, it is invalid, because prohibited by the Constitution of the United States, as impairing the obligation of contracts. Certainly, therefore, the presumption is that they were issued in aid of the rebellion, and until this presumption is overcome there ought to be, as I think, no recovery.

MR. JUSTICE BRADLEY. The question in this case is so fundamental in its character, that I cannot suffer the opinion of the majority to be read without expressing my earnest dissent from it.

The bank-notes issued by the Bank of Tennessee, which are claimed to be legal tender for taxes, in this case, were issued during the late civil war. Of course, whether they were new bills or old, whilst they were in the possession of the bank they were of no value. Being the obligations of the bank itself, they had no force or value until they were issued and put in circulation, — any more than the note or bond of an individual has value, whilst it is in his possession. In this respect they were totally different from the notes and obligations of others held by the bank. The latter had value when in the bank's possession, and were property. The bills in question were not property. When the bank issued them, then, and only then, they became property, by becoming obligations of the bank.

The issue of these bills, therefore, was the creation of new obligations on the part of the bank; just as much so as if the bank had made its bonds and issued them. And everybody who took them knew this. The thing was not done in a corner. It was known that these bills were of the "new issue," or the "Torbet issue," of the bank.

These bills, being thus new obligations of the bank, were issued for the purpose of raising funds for the bank or its owners. They were not given away. They were promises to pay, delivered to various parties for the sake of the consideration received therefor; and that consideration was sought for and received by the bank for the purpose of being used, — for the purpose, in other words, of furnishing the bank, and thereby

of furnishing its owners, with revenue for carrying on its and their operations and business.

Now, it appears on the record that this bank belongs to the State of Tennessee, and has no private stockholders. The first section of the charter, passed by the legislature in 1838, is in these words : " A bank shall be, and is hereby, established in the name and for the benefit of the State, to be known under the name and style of ' The Bank of Tennessee ; ' and the faith and credit of the State are hereby pledged for the support of the said bank, and to supply any deficiency in the funds hereinafter specifically pledged, and to give indemnity for all losses arising from such deficiency."

The second section shows how the capital of the bank was constituted : —

" The capital of said bank shall be five millions of dollars, to be raised and constituted as follows : The whole of the common-school fund, . . . as well as the proceeds of the Ocoee lands, shall constitute a part of the capital of the Bank of Tennessee; the surplus revenue on deposit with the State . . . shall also constitute a part of the stock of said bank ; and, in addition, . . . a sum shall be raised in specie, or funds convertible into specie at par value, on the faith of the State, sufficient to make the whole capital five millions of dollars," &c.

The sixth and seventh sections provide for the appointment of the directors of the bank, by the nomination of the governor and confirmation of the General Assembly.

The bank thus became the fiscal agent of the State. All its funds and property, all its resources of every kind, belong to the State, subject to the payment of its debts. The State, it is true, according to the decision in *Curran* v. *The State of Arkansas*, has no constitutional authority to appropriate the capital of the bank to the prejudice of its debts ; and it is not to be presumed that any lawful government of the State will do so. If it does, there are generally means, under the provisions of the Constitution, for preventing such a result.

The State, then, being the proprietor of the bank, and the latter being the fiscal agent of the State, it follows that the business operations of the bank inure entirely to the benefit of the State. The property and resources which were obtained

by the issue of the bills in question were obtained for the benefit of the State. The bills were issued in the interest and for the benefit of the State.

In pursuance of the idea that the bank was the property of the State, and that the faith of the State was pledged for its obligations, it was provided, by the twelfth section, " that the bills or notes of the said corporation, originally made payable, or which shall have become payable, on demand, in gold or silver coin, shall be receivable at the treasury of this State, and by all tax-collectors and other public officers, in all payments for taxes and other moneys due to the State."

The question in this case is, whether the State government, as reconstructed after the late rebellion, is absolutely and irretrievably bound by the twelfth section to accept for taxes and other public dues the bills issued by the bank when under the control of the insurgent government during the war.

If by the operation of general public law, or of any thing contained in the Constitution of the United States, the reconstructed and lawful government is so bound, it is more than the insurgents themselves ever expected, and more than the loyal people of the State supposed, when in 1865 they met together in convention, and adopted those ordinances and regulations which the changed condition of things required. They then declared that " all laws, ordinances, and resolutions of the usurped State governments, passed on or after the sixth day of May, 1861, providing for the issuance of State bonds, also all notes of the Bank of Tennessee, or any of its branches, issued on or after the sixth day of May, 1861, and all debts created or contracted in the name of the State by such authority, are unconstitutional, null, and void."

In favor of the proposition that the lawful State government, reorganized after the rebellion, is bound to recognize the bills in question, it is contended that the State of Tennessee has always remained the same State ; and that unless it be shown affirmatively that its acts and proceedings were intended to aid in the prosecution of the rebellion, they are all valid and binding on the reconstructed State.

The latter proposition I deny. The State can only act by its constituted authorities, — in other words, by its government ;

and if that government is a usurping and illegal government, the State itself and the legal government, which takes the place of the usurping government, are not bound by its acts.

In the case before us, the actual government of the State, for the time being, standing behind the direction of the bank, and creating that direction, exercised complete control over the operations of the bank. When the State government was in want of money, or other resources, for its immediate purposes, the bank, in obedience to its will, issued its obligations, and procured what was wanted.

The process by which this was done was equivalent, in the substance of the transaction, to the government issuing its own obligations, and thereby filling its treasury.

In the exigencies of the war, the then government of Tennessee was in need of every possible resource that could be compelled into contribution. It cannot reasonably be doubted that the very object of this extraordinary new issue of bank circulation was intended for the purpose of enabling the government to carry on its operations. The fact that the bills themselves commanded only a fraction of their par value is proof that they were not issued in the regular course of business, but that the proceeds received therefor were destined for other uses than legitimate banking.

But in my view of the case, it is not necessary to invoke any presumptions of this sort, to deny to these bills the quality of legal tender in the payment of taxes imposed by the lawful government of the State. The original contract contained in the charter of the bank, to the effect that its circulation should be receivable in payment of taxes, was based on the consideration that the State, as proprietor of the bank, received the benefit of the circulation, and was pledged for its redemption. Hence it followed, by an almost necessary implication, that it should honor that circulation so far as to take it for cash, when offered in payment of its own taxes. It never could have been the intent or implication that if a usurping government should at any time obtain the control of the State and its finances, including this very fiscal agency, the issues of the bank made during the period of such usurpation should be honored in the same manner.

Now if the position of the majority of the court is correct, that there never was any usurpation of the State government in Tennessee during the late civil war, and that the State had all the time a lawful government of its own (for that is what the argument amounts to), then I concede that the conclusion reached is unavoidable. If this be true, then I do not see why all the obligations issued by the State during the war, whether in the shape of bonds, or certificates of indebted-ness or otherwise, are not equally obligatory as these bills. How is it to be proved which of them was issued for carrying on the war, and which were not? Upon the assumption made, they are all *prima facie* valid. But this, of course, is only a collateral consideration.

I deny the assumption that the governments of the insurgent States were lawful governments. I believe, and hold, that they were usurping governments. I understand this to have been the opinion of this court in *Texas* v. *White*, 7 Wall. 700. The very argument in that case is, that whilst the State as a community of people remained a State rightfully belonging to the United States, the government of the State had passed into relations entirely abnormal to the conditions of its constitutional existence. "When the war closed," says Mr. Chief Justice Chase, speaking for the court, "there was no government in the State except that which had been organized for the purpose of waging war against the United States. That government immediately disappeared. The chief functionaries left the State. Many of the subordinate officers followed their example. Legal responsibilities were annulled or greatly impaired." Again he says: "There being then no government in Texas in constitutional relations with the Union, it became the duty of the United States to provide for the restoration of such government." Again, in speaking of the power and duty of Congress to guarantee to each State a republican government, and the necessary right which follows therefrom to decide what government is established in each State, the Chief Justice makes the following quotation from the opinion of Mr. Chief Justice Taney in the case of *Luther* v. *Borden* (7 How. 1), who says: "Under the fourth article of the Constitution, it rests with Congress to decide what government

is the established one in a State. For as the United States guarantee to each State a republican government, Congress must necessarily decide what government is established in the State, before it can determine whether it is republican or not."

Mr. Chief Justice Chase proceeds to say, " This is the language of the late Chief Justice, speaking for this court, in a case from Rhode Island, arising from the organization of opposing governments in that State. And we think that the principle sanctioned by it may be applied with even more propriety to the case of a State deprived of all rightful government, by revolutionary violence ; though necessarily limited to cases where the rightful government is thus subverted, or in imminent danger of being overthrown by an opposing government, set up by force within the State."

The actual course of things taken in the seceding States, so fully detailed by the Chief Justice in *Texas* v. *White*, are demonstrative, it seems to me, of the position which I have assumed. The several State governments existing or newly organized at the times when the ordinances of secession were respectively adopted, assumed all the branches of sovereignty belonging to the Federal government. The right to declare war, raise armies, make treaties, establish post-offices and post-roads, impose duties on imports and exports, and every other power of the government of the United States, were usurped by the said State governments, either singly, or in concert and confederacy with the others. They assumed to sever the connection between their respective communities and the government of the United States, and to exercise the just powers belonging to that government. That such governments should be denominated legal State governments in this country, where the Constitution of the United States is and ought to be the supreme law of the land, seems to be most remarkable. The proposition assumes that the connection between the States and the general government is a mere bargain or compact, which, if broken, — though unlawfully broken, — still leaves the States in rightful possession of all their pristine autonomy and authority as States.

I do not so read the constitution of government, under which we live. Our government is a mixed government, partly state,

partly national. The people of the United States, as one great political community, have willed that a certain portion of the government, including all foreign intercourse, and the public relations of the nation, and all matters of a general and national character, which are specified in the Constitution, should be deposited in and exercised by a national government; and that all matters of merely local interest should be deposited in and exercised by the State governments. This division of govern-mental powers is fundamental and organic. It is not merely a bargain between States. It is part of our fundamental political organization. Any State attempting to violate this constitution of things not only breaks the fundamental law, but, if it establishes a government in conformity with its views, that government is a usurping government, — a revolutionary government, — as much so as would be an independent government set up by any particular county in a State. If the city of New York should set up a separate government independent of the government of the State, it would be a usurping and revolutionary government. It might succeed, and make itself independent, and then there would be a successful revolution. But if it did not succeed, if it were put down, every one would call it a usurping and unlawful government whilst it lasted, and none of its acts would be binding on the lawful government.

I do not mean to say that States are mere counties or provinces. But I do mean to say, that the political relation of the people of the several States to the Constitution and government of the United States is such, that if a State government attempt to sever that relation, and if it actually sever it by assuming and exercising the functions of the Federal government, it becomes a usurping government.

We have always held, it is true, that, in the interests of order and for the promotion of justice, the courts ought to regard as valid all those acts of the State governments which were received and observed as laws for the government of the people in their relations with each other, so far as it can be done without recognizing and confirming what was actually done in aid of the rebellion. This is required by every consideration of justice and propriety. But this is only what is always conceded to the acts and laws of any actual government, however invalid.

The action of all the States, after the rebellion was over, shows that they did not consider the insurrectionary governments as legal governments, nor the laws by them enacted as having any binding force or validity *proprio vigore*. In every case, it is believed, ordinances or laws were passed either adopting the laws passed during the insurrection, with certain exceptions duly specified, or declaring them all to be invalid, with the exception of such as it was deemed proper to retain. This was done in Tennessee. It was done in all the other States.

The proceedings and acts of Congress and the Executive after the war was at an end, having in view the reconstruction of the insurgent States, are all based on the same idea; viz., that the governments of those States when in rebellion were usurping governments, and that their acts were void. The various pardons and proclamations of amnesty, and acts of rehabilitation to citizenship, passed by Congress, all look in the same direction.

In England, at the close of the Commonwealth, and the restoration of Charles II., no act passed during that whole period of twenty years, from 1640 to 1660, was ever received or admitted as law. Not one of them is found in the statute-book. Some laws which were of great public concern, and actual improvements in the legislative code, were re-enacted, and became laws under Charles II.

It is said that the national obligations of the English government, created during the period in question, were recognized by the restored government. But it is well known that this was a matter of compromise and concession. General Monk held the reins in his own hands as commander of the army, and refused to surrender them until all proper measures for insuring the public tranquillity and satisfaction were agreed to. The royalists were glad to get back into power on these terms. As to the public relations of the kingdom, it would have been arrant folly not to have adopted what had been done. Besides the fact that these relations came under the operation of general public law, in which other nations were deeply concerned, — one cardinal rule of which is, that every nation in its relations with other nations is bound by the acts of its actual government, whether legal or *de facto*, — it was the clear interest of the English nation to stand to the public negotiations of Cromwell;

for no English sovereign had ever wielded the sceptre of public affairs with greater ability and energy.

There is nothing, therefore, in this historical instance to support the opinion of the court.

It is undoubtedly true that, when revolutions in governments occur, the new governments do often, as matter of policy, and to prevent individual distress among the citizens, assume the obligations of the governments to which they succeed. But this is done from motives of public policy only, and is not submitted to as a matter of absolute right. Such was clearly the relation of the lawful State governments to the obligations of the usurping governments, at the close of the civil war in this country. They could assume them or not, as they saw fit. In the case before us, the obligation in question was expressly repudiated. And it seems to me that, in addition to the express repudiation of the Convention of 1865, that part of the Fourteenth Amendment of the Constitution of the United States which prohibits the United States or any State to assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, applies to the case.

Whether the community of people constituting the several States remained States during the insurrection is of no consequence to the argument. The question is, whether the State governments were or were not legal governments, and whether the obligations by them assumed are binding upon the lawful government of the State.

That the acts of secession were void, of course no one denies. The civil war was carried on by the United States government to demonstrate their nullity. But neither has that any thing to do with the question as to the validity of the State governments which waged war against the United States, except to make it more certain and indubitable that they were usurping governments.

It seems to me that the attempt to fasten upon the lawful government of Tennessee an obligation to receive as cash bills that were issued under the authority of the usurping government of that State whilst it was engaged in a deadly war against the government of the United States, is calculated to introduce evils of great magnitude; that it will ultimately lead

to the recognition of the war debts of the seceding States, not-withstanding the prohibition of the Fourteenth Amendment of the Constitution.  But this I would regard as a far less evil than the establishment of doctrines at war, as I think, with the true principles of our national government, as well as with the established rules of public law.

MR. JUSTICE HARLAN.  I dissent altogether from so much of the opinion of the court as declares that the State of Tennessee, as represented by its existing government, is bound to receive, in payment of taxes levied under its authority, the notes of the Bank of Tennessee, issued after May 6, 1861, and during the period when that State was dominated by a revolutionary organization which usurped the functions of the lawful State government.

It is claimed that the obligation of the existing government of Tennessee to receive these bank-notes for taxes arises out of the twelfth section of the bank's charter, granted in 1838, which provides "that the bills or notes of the said corporation, originally made payable, or which shall have become payable, on demand, in gold or silver coin, shall be receivable at the treasury of this State, and by all tax-collectors and other public officers, in all payments for taxes and other moneys due to the State."

The purposes for which the bank was organized, and the relations created between it and the State by its charter, are thus stated in *Furman* v. *Nichol*, 8 Wall. 44.

"The State of Tennessee, through its legislature, in 1838, thought proper to create a bank ' in its name and for its benefit.'  It was essentially a State institution.  The State owned the capital and received the profits, appointed its directors, and pledged its faith and credit for its support."

It was because the State, through directors of its appointment, had the absolute control of the operations of the bank, owning its capital and enjoying its profits, that it made the agreement contained in the twelfth section of the charter. That agreement unquestionably constituted, as between the State and the holders of the bank's notes, a contract, the obligation of which the State was forbidden by the Federal Con-

stitution to impair. Such was the decision of this court in *Furman* v. *Nichol* (*supra*), as to all bills issued by the bank prior to May 6, 1861. In that case, while expressly waiving any decision of the question as to the liability of the State for bills issued between May 6, 1861, and the date of the restoration of its lawful government, we held that the guaranty contained in the twelfth section of the charter " was, until withdrawn by the State, a contract between the State and every note-holder of the bank," obliging the State to receive for taxes any notes issued prior to May 6, 1861. But it is to be observed that the State which made this contract with note-holders was the State which was represented by the lawful government thereof. The notes which it agreed to receive for taxes were necessarily only those issued by the authority, or under the orders, of directors appointed by that lawful government. It was not an agreement to receive notes issued under the orders of usurping directors, or by directors appointed by, or exercising their functions under, any revolutionary government, which, by violence, should displace the lawful government of the State. Upon the temporary overthrow of the latter government, on the 6th of May, 1861, all the State institutions, including the Bank of Tennessee, were seized by the usurping government, and were thereafter, and until the legal authorities resumed, or were reinstated in the exercise of, their functions, controlled and managed by the usurping government for its own benefit and maintenance. The notes in question were issued under the orders of directors who repudiated all responsibility to the government which made the contract embodied in the twelfth section of the bank charter. If the issue of such notes imposed obligations upon any State government, it was upon the insurgent State government, whose official agents had directed them to be issued. In the very nature of things, and so long as the duty exists to discourage revolution, by maintaining lawfully constituted authority, no obligation could arise against the State government which had been wrongfully displaced, and whose right to control and manage the bank, by directors of its appointment, was not only denied and repudiated, but was forcibly, and for some time successfully, resisted. And this view does no injustice to citizens of Tennessee who received

the notes of the bank in the ordinary course of business. They were aware of the fact that these notes were issued under revolutionary authority. They did not take them upon the credit of the lawful government, or upon any faith they had in its restoration. They took them upon the credit of the usurping State government, under whose authority and for whose benefit they were issued, and which government, at that time, was regarded by the mass of the people of Tennessee as established upon a firm and enduring foundation.

But it is said that this court has frequently decided that the ordinary acts and transactions of the Confederate State governments, which had no direct connection with the support of the insurrection against the authority of the Union, were to be deemed as valid as if they had been the acts and transactions of legitimate legislatures. The argument upon this branch of the case necessarily rests upon the assumption that the notes of the bank issued, under usurping authority, after May 6, 1861, were not issued, or do not appear to have been issued, for the purpose of aiding the insurrection or in hostility to the Union. This assumption, however, cannot be successfully maintained without excluding from consideration well-known historical facts. The government of the Confederate States of America had its origin in the purpose to dissolve the Union formed by the Federal Constitution, and to overthrow the national authority in the States declared to be in insurrection. The revolutionary governments of the insurrectionary States had their origin in, and were formed for, a like purpose. The existence of the former depended upon the existence of the latter. All moneys, therefore, raised by the revolutionary State government, for *its* support and maintenance, may be deemed, in every substantial legal sense, as having been raised for the support and maintenance of the Confederate government in its efforts to overturn the government of the United States. But in the view which I take of this case, and of the principles which must govern its decision, it is immaterial whether the notes were or were not issued in direct aid of the rebellion. They were the obligations of an institution controlled and managed by a revolutionary usurping government, in its name, for its benefit, and to prevent the restoration of the lawful State

government. It was that revolutionary government which undertook to withdraw the State of Tennessee from its allegiance to the Federal government and make it one of the Confederate States. When, therefore, the people of Tennessee, who recognized the authority of the United States, assembled by their delegates in convention, in January, 1865, it was quite natural, and, in my judgment, not in violation of the Federal Constitution, that they should declare, by an amendment of the State Constitution, that "all laws, ordinances, and resolutions of the usurped State governments passed on or after the 6th May, 1861, providing for the issuance of State bonds, also all notes of the Bank of Tennessee, or any of its branches, issued on or after the 6th May, 1861, and all debts created or contracted in the name of the State by said authority, are unconstitutional, null, and void; and no legislature shall hereafter have power to pass any act authorizing the payment of said bonds or debts, or providing for the redemption of said notes." And this amendment of the State Constitution was duly ratified by a popular vote in that State on 22d February, 1865.

After carefully examining the former decisions of this court, and regarding the special facts and circumstances of each case heretofore decided, I do not perceive that any thing declared by us is at all inconsistent with the position that it was competent for the lawful government of Tennessee, when restored to the exercise of its just authority, to refuse to meet the obligations of the usurping State government, or to recognize the notes which had been illegally issued in the name of a State banking institution by the directions, and for the benefit, of the revolutionary organization which had violently displaced the regular and lawful State government. There may be some difficulty in defining precisely what acts of the usurping State government the restored State government should have recognized as valid and binding. It may be true that there were some of them which should, upon grounds of public policy, have been recognized by the lawful government as valid and binding. It may be that, in the absence of any declaration to the contrary by the latter, the courts should recognize certain acts of the revolutionary government as *prima facie* valid. But I am unwilling to give my assent to the doctrine that the Constitution

of the United States imposed upon the lawful government of Tennessee an obligation, which this court must enforce, to cripple its own revenue, by receiving for its taxes bank-notes issued and used, under the authority of the usurping government, for the double purpose of maintaining itself and of defeating the restoration of that lawful government to its proper relations in the Union. Lawful government should not be required to pay the expenses incurred in effecting and maintaining its overthrow. Tennessee, as one of the United States, cannot be under a constitutional duty to recognize the governmental obligations of those who, by revolution, and in violation of the Federal Constitution, overthrew the legitimate State government, not because of its administration of the internal affairs of that State, but solely because of its adherence to the Federal Union, and its refusal to acknowledge the authority of the Confederate government. If the insurrectionary State government had, during the recent war, urged the people in insurrection to take the notes of the Bank of Tennessee at par, upon the ground that the lawful State government, if restored, would be required by the courts of the United States, whose government they were endeavoring to overturn, to receive them in payment of taxes, and if the insurgents had believed such to be the law of the land, the treasury of the Confederate State government would have had more money than it did have to carry on the work of revolution.

Upon these grounds, which I will not further elaborate, I feel obliged to dissent from the conclusions reached by the court.